(Reap. Dec. 11121)

J. E. Bernard & Co., Inc. *v.* United States

Entry No. 5992, etc.

(Decided January 4, 1966)

*Sharretts, Paley & Carter* (*Howard Clare Carter* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Morris Braverman,* trial attorney), for the defendant.

Nichols, Judge: The merchandise involved in these cases, consolidated at the trial, is a chemical called parachlorometaxylenol, described on the entries as a coal-tar product having a medicinal property. It was exported from the United Kingdom between June and October 1962, inclusive, and was appraised on the basis of American selling price at $2.25 per pound, less 1 per centum, packed, not including the value of the drums, which were appraised separately at $7.50 each, net, packed. The basis of valuation is not disputed, but it is claimed that the correct American selling price is $1.80 or $1.70 per pound, less 1 per centum, including the value of the drums.

The merchandise is not on the final list published by the Secretary of the Treasury, T.D. 54521, and is subject to valuation under the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The pertinent provisions of said act, as amended, are found in section 402, as follows:

(e) American Selling Price.—For the purposes of this section, the American selling price of any article produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the article in condition packed ready for delivery, at which such article is freely sold, or, in the absence of sales, offered for sale for domestic consumption in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities, or the price that the manufacturer, producer, or owner would have received or was

willing to receive for such article when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\* \* \* \* \* \* \*

(5) The term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

Plaintiff's first witness was Dr. Sol Boyk, president of the Ottawa Chemical Co. (hereinafter called Ottawa). He testified that he has been associated with that company since 1948 and that his duties include the selling of material manufactured by it. He was familiar with the prices and terms and conditions of sale of parachlorometaxylenol during the period from 1959 to date. During the period from 1959 through 1961, Ottawa was offering that material as follows:

$4     per pound for 1-pound lots
$3     per pound for 10-pound lots
$2.50  per pound for 100-pound lots
$2.25  per pound for ton lots

As to larger quantities, he stated:

We didn't usually offer it in those terms because there weren't many people who bought those quantities, but when we did we were selling it at that time in quantities of 200,000 pounds, as a matter of fact, at $1.80 per pound.

According to the witness, these prices were in effect since 1951, but, from 1951 through 1956 or 1957, none was sold in these large quantities. In the period from 1959 through 1961, inclusive, Ottawa received more dollars at the $1.80 price than at any other price, and this reflected the sale of more pounds of material. When asked what price Ottawa would have received or was willing to receive between June 3, 1962, and October 7, 1962, in quantities of 100,000 pounds or more, the witness replied:

It's a hard question to answer for this reason, when you are talking about quantities like that you are approaching the horse trading area. I am sure that we would have been glad to sell it at $1.80 a pound.

On cross-examination, Dr. Boyk admitted that, during the period June 3 to October 7, 1962, Ottawa had made no contracts or sales in quantities of 200,000 pounds but said that, during the period 1959 to 1961, it had made one such sale. A copy of a letter from Ottawa to Helene Curtis Industries confirming a sale of 200,000 pounds of such material at $1.80 per pound was received in evidence as defendant's exhibit A. It is undated but purports to confirm a conversation on April 30, 1957. The witness stated that shipment under the contract began in 1958 and was never completed. A total of 138,000 pounds was shipped, the last shipment being in 1963.

Dr. Boyk stated that, during the period 1959 through and including October 1962, Ottawa was offering this merchandise at $2.25 a pound in ton lots and that sales were made in substantial amounts. Ottawa is still offering the merchandise at $1.80 "in the sense that if anybody talked to us about quantities of 100 or 200 thousand pounds we would be glad to sell it at that price." It was not soliciting at that price and had not made any sales at that price. The only sale made at that price was the one mentioned. The price of $1.80 was subject to a cash discount of 1 per centum and included the price of the drums.

Plaintiff's second witness was Dr. Arthur Goldman, president of Argol Chemical Laboratories (hereinafter called Argol). He testified that he has been associated with that company since 1958 and that his duties include managing operations and sales. Argol had manufactured parachlorometaxylenol from 1959 to June 1962, and he was familiar with the prices and terms of sale. From 1959 through the fall of 1961, Argol had offered this material in quantities of 10,000 pounds or more at $1.80 per pound. From then, until June 1962, it was offered at $1.70 per pound. Production ceased in June 1962.

The prices quoted were subject to a cash discount of 1 per centum and included the cost of containers. For the period from June 1962 through October 1962, Argol had the equipment available for the manufacture of parachlorometaxylenol and the raw materials were

readily available. The price the company was willing to receive or would have received during that period was $1.70 per pound, less 1 per centum.

Dr. Goldman testified that 95 percent of Argol's production was sold in 10,000-pound lots, because Helene Curtis was its major buyer and that other sales were made through a sales agent but only in small quantities, about 300 pounds in all. The price was the same but the sales agent repackaged and tried to sell at "another price." Argol received continuing orders of 10,000 pounds from Helene Curtis. In 1959, it shipped 13,700 pounds, representing the completion of one order and the partial fulfillment of another. In 1960, it shipped 17,500 pounds and, in 1961, 27,400 pounds. Argol is not listed as a producer of parachlorometaxylenol in the chemical blue book nor in any trade bulletin. It made known the fact that it was a producer by contacting users or potential users, but did not make any offers. Argol had not contacted Helene Curtis, but that firm had asked if it could manfacture the material. A price of $1.80 a pound for an order of 10,000 pounds was agreed upon.

The sole issue in this case is what is the American selling price of a similar competitive article produced in the United States. The appraiser has found that price to be $2.25 per pound, and the burden rests on the importer to establish that that price is incorrect and to establish further what the correct price is. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495; *Kobe Import Co.* v. *United States*, 42 CCPA 194, C.A.D. 593; *United States* v. *Baar & Beards, Inc.*, 46 CCPA 92, C.A.D. 705.

The plaintiff herein has not introduced any proof that the appraiser's determination is wrong It is presumed correct. The court does not have any evidence as to what domestic merchandise the appraiser selected as the counterpart, or by whom produced. There was no evidence that Ottawa and Argol were the sole United States producers. There may have been others, so far as the record shows, and they may have produced and sold quantities bearing any relation to the production and sales in evidence; more, possibly, or less. If they produced and sold more, or comparable quantities, appraisement based on their selling practices, different from those in evidence, could have had a valid legal foundation. At any rate, to find the appraiser wrong, I would at a minimum have to negative the existence of other sellers, or else find that their sales could not be a basis of a lawful appraisement at $2.25 a pound, neither of which can be done on the present record. Even if the prices received of Helene Curtis by Ottawa and Argol are "freely offered," I have no way of knowing whether they reflect the "usual wholesale quantity" and the "ordinary course of trade" for dealers in and users of parachlorometaxylenol. The court knows nothing about that trade.

Helene Curtis was the only customer who bought from the two domestic suppliers here involved in the quantities claimed to be the usual wholesale quantities. Satisfactory, convincing evidence even of free offers to others at Helene Curtis' prices is lacking. Helene Curtis must be considered a "selected purchaser at wholesale." Obviously, its price was the product of a "horse trade," as Dr. Boyk admitted in words and Dr. Goldman in substance. Hence, the price to Helene Curtis must "fairly reflect the market value" to be a proper measure of American selling price. There is no evidence of what the market value was. The court may perhaps, with hesitation, assume without evidence, that the parties dealt at arm's length. The requirements of Helene Curtis were so immense, compared to that of Ottawa's and Argol's other customers for such merchandise, that it could well have been in a favorable position to purchase at below market value if it wished, even from arm's length suppliers. The court is not told whether the volume of its purchases, and the delivery schedules, made economies possible to the sellers, justifying the price differences. What evidence might establish in such circumstances that the prices did fairly reflect the market value, is a moot question when no evidence is offered. The concept of a "horse trading" price, in its common meaning, raises possibilities of concessions by the buyer as to delivery dates, relationship of size of deliveries to amounts of production runs, standards of purity, terms of payment, etc., all of which would mean that a financially able buyer would not necessarily get the price just by being willing to take the alleged "usual wholesale quantity." Hence, such a price does not presumptively reflect market value, and if it did so in fact, that would have to be shown. So far as the evidence goes, Ottawa's price of $2.25 for ton lots was the lowest freely offered price and whether the appraiser based his appraisement on sales or offers by Ottawa, or someone else, plaintiff has failed to show it is aggrieved.

Finally, to complete the demonstration that air is the underpinning of plaintiff's structure, it will suffice to add this: Although we have so far assumed, *arguendo*, that the merchandise Ottawa and Argol sold to Helene Curtis was of domestic origin, there is not a word in the record to establish that it is! I would dislike to base fact findings or a judgment order on this ground alone, because the Government has not mentioned the matter in its brief and may know the merchandise was domestic. However, it certainly seems to me that a party seeking to establish an American selling price should show as part of his case that the price he relies on is for domestic merchandise.

Plaintiff, in its brief, claims it has shown, in the alternatives allowed by the statute, what price its domestic producers "would have received" or were "willing to receive." I do not think the evidence justifies me in finding that they would have quoted or were willing

to quote any price more favorable than $2.25 in the period June through October 1962, the period of the importations, except as a "horse trading" price. Such a price would suffer from all the same infirmities as a basis for a statutory American selling price value as their actual sales and offers of an earlier date, and, therefore, need not be considered further.

Plaintiff thus has not shown its claimed value is correct.

It may seem harsh that imported merchandise invoiced as here at 85.75 cents per pound should be "appraised" and "reappraised" at $2.25 per pound. However, as I pointed out in *A. Zerkowitz & Co., Inc. v. United States*, 55 Cust. Ct. 643, Reap Dec. 11095, the Congress which could have embargoed this merchandise has elected merely to make its importation financially onerous. It may well be that the preponderance of domestic merchandise was sold in 1962 at $1.70 or $1.80 per pound, though plaintiff did not prove this. Even if it were true, that would fail, without more, to establish that the Congress intended $1.70 or $1.80 to constitute the legal American selling price. Plaintiff may have supposed the Customs Simplification Act of 1956 to move in that direction and no doubt, in some fact situations, it does. The burden of proof on one seeking to overturn an appraiser's American selling price valuation remains onerous, and, in other circumstances, the price at which a lesser volume is sold at a higher price may still be the American selling price, even if all the facts are known.

The appraised values are sustained.

I find as matters of fact:

1. That the merchandise involved herein is a chemical called parachlorometaxylenol, a coal-tar product enumerated under paragraph 27 of the Tariff Act of 1930, exported from the United Kingdom between June and October 1962, inclusive.

2. That said merchandise is not on the final list published by the Secretary of the Treasury, T.D. 54521, and is subject to appraisement under section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. That said merchandise was appraised on the basis of American selling price, as that value is defined in section 402(e) Tariff Act of 1930, as amended, at $2.25 per pound, less 1 per centum, packed, not including the value of the drums, which were appraised separately at $7.50 each, net, packed.

4. That Argol Chemical Laboratories sold this merchandise at $1.80 per pound from 1959 to the fall of 1961 in large quantities to Helene Curtis Industries and in much smaller quantities to an agent or distributor; but it did not offer the said merchandise to anyone else at that price and the price was arrived at by negotiation.

5. That such merchandise was freely sold by Ottawa Chemical Company during the period of exportation of the imported article at $2.25 per pound, less 1 per centum, packed, in ton-lot quantities, in substantial quantities. That Ottawa had made a contract in 1957 with Helene Curtis Industries for the sale of 200,000 pounds at $1.80 per pound; that deliveries thereunder continued through 1963; that, in 1959, 1960, and 1961, the greatest aggregate volume of the merchandise it sold was at $1.80 per pound under this contract; that Ottawa had made no sales other than under the contract in that quantity or at that price; that Ottawa had not actively solicited at that price, and had not made known its willingness to sell in that quantity at that price to any prospective customer; that the said contract was made after negotiation and was a "horse trade."

I conclude as matters of law:

1. That American selling price, as defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the appraisement of the imported merchandise.

2. That plaintiff has not overcome the presumption of correctness attaching to the values found by the appraiser on the basis of American selling price.

3. That the American selling price is represented by the values found by the appraiser.

Judgment will be rendered accordingly.