(R.D. 11169)

F. B. VANDEGRIFT & CO., INC. *v.* UNITED STATES

Entry No. 16886.

(Decided May 9, 1966)

*Allerton deC. Tompkins* for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Harvey A. Isaacs* and *Glenn E. Harris*, trial attorneys), for the defendant.

NICHOLS, Judge: The merchandise involved in this appeal for reappraisement consists of two kinds of linoleum, natural tan and

sea green, exported from the United Kingdom on or about December 7, 1960, and entered at the port of Philadelphia on December 30, 1960.[1] It was appraised on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The merchandise is not on the final list (T.D. 54521). Plaintiff does not contest the basis of valuation but only the amount thereof. The following are the appraised and claimed values for the merchandise, all less trade and cash discounts of 10 percent and 5 percent, less ocean freight and insurance, plus special packing:

|  | Appraised (per lineal yard) | Claimed (per lineal yard) |
| --- | --- | --- |
| Natural Tan No. 2 B300 | $3.05 | $2.54 |
| Sea Green 25/2 B312 | 3.31 | 2.91 |

The pertinent provisions of section 402 of the Tariff Act of 1930, as amended, are as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

(f) DEFINITIONS.—For the purposes of this section—
(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
(A) to all purchasers at wholesale, or
(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.
(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to mer-

---

[1] The merchandise was appraised on October 19, 1961, and appeal for reappraisement timely filed. The case was heard and submitted before me at Philadelphia on March 9, 1965. Plaintiff's brief was filed on December 10, 1965, and defendant's brief on March 4, 1966. A reply brief was filed, by permission of the court, on April 1, 1966.

chandise of the same class or kind as the merchandise undergoing appraisement.

\*    \*    \*    \*    \*    \*    \*

(5) The term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

At the trial, Arthur B. Dodge, Jr., vice president and secretary of Dodge Cork Co., Inc. (hereinafter called Dodge), testified for the plaintiff. He stated that Dodge manufactures and sells all manner of cork products, including linoleum, and that he is responsible for all phases of manufacturing and the importation of raw materials and semifinished products from suppliers in Europe. He was instrumental in negotiating for the material involved herein from Barry, Ostlere & Shepherd, Ltd. (hereinafter called Barry), and had purchased it. Such merchandise is normally imported in rolls measuring either 49 or 73 inches in width, and approximately 65 to 90 feet in length, in either 1/8- or 1/4-inch thickness. The rolls involved here were 49 inches wide and approximately 90 feet long. The witness said that in 1960 Dodge was a customer of Barry, but that there was no exclusive arrangement between them. The prices shown on the invoice, the higher price being for the rolls in color, were arrived at by negotiation, as follows:

Very frankly, it was originally through an attempt to sell them cork that I found out they could produce a product we could sell in this country, that is buy from them and sell in this country, and therefore on an arrangement whereby we could take a certain volume of their goods per annum, we agreed to a basic set of prices, and as long as we were able to take up that volume, we could buy at those prices. The prices, incidentally, were renegotiated from time to time on the basis of raw material cost, their manufacturing cost, etc.

The price was dependent upon an annual dollar volume of purchases, which during the period from 1955 through 1962 ranged between $130,000 to $200,000. The price did not vary with the quantity purchased in an individual order. While Dodge was not required to purchase a certain amount each year, it was understood that if it did not maintain some kind of volume, the manufacturer could not afford to make the merchandise at that price and would not be satisfied with selling at low prices. There was no guarantee that the prices would not change, and they did change on several occasions.

Mr. Dodge stated that his firm usually ordered in quantities of 50 to 200 rolls and that orders for less than 50 rolls were rare because

uneconomical. Dodge tried to accommodate to Barry's production schedule, gave the manufacturer a long-range anticipated requirement, and sent separate orders several times a month. The size of the individual shipments had no connection with the overall volume of transactions. The witness explained:

* * * The reason this figure of 50 rolls comes into play is because in the linoleum industry that represents a certain number of lineal yards of goods, which is the smallest economical unit they have to run, because the linoleum is first calendered and then put in a stove, and they have to make a minimum run; otherwise their cost goes out of line, so in the trade if you go into a linoleum factory and ask for a special color or pattern, a special width, they talk in a minimum of 50 rolls. By the time 1960 had come along, the 50 rolls business did not play such an important part because of our relationship. We had proven ourselves. When they originally approached us, they talked in terms of 50 rolls, and in talking to a new person, they would talk in terms of 50 rolls, but it became less important because we were dealing in hundreds and thousands of rolls, and therefore they knew what their relationship was with us.

The court received in evidence an affidavit of John Houghton, who was a director of Barry, from August 1960 through September 1962 and was responsible for export sales of linoleum by that company. (Plaintiff's exhibit 3). The affidavit states that, during that period, Barry had two price schedules for the kind of linoleum involved herein, as set forth in an attached appendix. According to the affiant:

* * * The prices set forth in said Appendix A I were the prices at which the Company was willing to sell linoleum to reputable wholesalers in the U.S.A. buying in wholesale quantities of about 50 rolls or more per order, who at their own cost, were willing to carry extensive stocks, provide promotional material, and to advertise. Prices shown in Appendix A II were the prices at which the Company sold and was willing to sell to reputable users in the U.S.A. and small jobbers who customarily bought less than 25 rolls per order, with a small annual purchase volume of linoleum. Total sales in the U.S.A. during the period August 1960 through September 1962 are shown on Appendix B.

Appendix A (I) gives, among others, the prices per lineal yard claimed by plaintiff and appendix A (II) gives the appraised values. Appendix B shows sales to Dodge of 3,546 rolls and to others of 322 rolls.

The affidavit states that during the period mentioned, Dodge qualified to purchase at the prices shown on appendix A (I) and made purchases at those prices. Linoleum Manufacturing Co., Ltd., of England purchased similar linoleum at the same or slightly lower prices. Between October 1960 and May 1961, no other United States dealer had approached Barry with a view to obtaining the lower prices

listed in appendix A (I). Had there been such an approach from a responsible company prepared to accept terms similar to those given to Dodge, Barry "would at all times have been prepared to negotiate prices at the level specified in appendix A I."

The affiant also stated that it was normal in the linoleum floor covering trade to sell at lower prices to wholesalers who purchase large quantities and that he knew that no other manufacturer in England made and shipped linoleum such as that sold by his firm to Dodge during the 1960–62 period.

Defendant's collective exhibit A contains a letter from Barry, dated December 5, 1962, stating:

Until October of this year, we had two price schedules, one for the Dodge Cork Company whose purchases over the last few years have been in excess of $125,000 per annum and who at their own cost carried extensive stocks, provided sales promotion material and advertised. We would have been prepared to consider applying this schedule to other companies in the Cork trade provided they were prepared to give a similar service. The other price schedule applied to jobbers who normally buy in small lots of 10 to 50 rolls, on occasions few as 5 rolls, and these jobbers are supplied free with samples and promotional material.

Price schedules dated November 7, 1960, were attached, giving the $2.54 and $2.91 prices on the list marked "Wholesale U.S.A." and the $3.05 and $3.31 prices on the one marked "Jobbers in U.S.A." The prices are stated to be "c.i.f. duty unpaid U.S. port of entry served by direct steamer."

Mr. Dodge testified that during the period 1960–61 his firm purchased at the prices set forth in appendix A (I), c.i.f. United States ports with discounts of 10 percent and 5 percent. The merchandise was specially packed for overseas shipment for which a charge of $25.20 was made in this case.

Mr. Dodge did not know whether any other persons in the United States qualified for the prices in appendix A (I) during 1960–61. He knew of sales made to other wholesalers in small quantities at the appendix A (II) prices because Dodge had not wanted to take the financial risk in dealing with them and had asked Barry to ship to them directly and give Dodge a commission. One of these purchasers was Greensteel-Korak which at that time could not obtain the price Dodge obtained because its volume was not large enough.

Plaintiff claims that the linoleum here involved was freely sold for exportation to the United States at two price schedules, one to "large wholesale buyers buying in quantities of about 50 rolls or more" and the other to "small wholesale buyers buying in quantities of about 25 rolls or less"; that sales in the former quantity were in an aggregate

volume greater than sales in the latter quantity, and that, therefore, the former constitutes the usual wholesale quantity and the price for such quantity is the export value.

The appraiser must have found that the merchandise was freely sold or offered for sale to the less favored purchasers at the higher price and that it met the other specifications for statutory export value. His findings must stand unless the evidence refutes them. Plaintiff has not tried to show that the merchandise was not freely sold or offered to all purchasers at that price.

The plaintiff does claim the merchandise was freely sold, or offered for sale, at the price to Dodge, the favored purchaser. The attempt to prove this does not succeed. The evidence reflects, and I find the fact to be, that no one other than Dodge could have purchased at Dodge's prices in a quantity however large, unless he opened negotiations with the sellers and satisfied them that he was equally desirable with Dodge as a customer, and this in respects in addition to the volume he wished to order.

He would have to be willing to maintain large inventories, furnish promotional material, and advertise. The fact that a person who met these conditions could buy at Dodge's prices was locked in the breast of the seller, not communicated to any potential United States customer. No extended dissertation by me is required to show that this is not a freely offered price.

I have considered whether Dodge was a selected purchaser at wholesale whose price fairly reflected market value. Plaintiff made no attempt to prove the market value of the merchandise, but as the parties dealt at arm's length it could be no proof was required. The pamphlet publication "Valuation, Customs Simplification Act 1956," issued by the Commissioner of Customs, December 12, 1956 (i.e., the year the act was passed), indicates that such proof will be necessary only in case of transactions between related persons. This seems to me an over simplification. There are other circumstances when I would look for some degree of proof, as I indicated in *J. E. Bernard Co., Inc.* v. *United States*, 56 Cust. Ct. 583, Reap. Dec. 11121. Here Dodge appears to have been in the seller's eyes so uniquely desirable a customer it might have been able to buy under market value. Dodge claims it was a "guaranteed" outlet for the seller's entire production. The Congress had manifestly no intent to authorize appraisements below market value, and a reappraising judge must make sure he is not doing this. It is not necessary to go into market value in greater depth because plaintiff fails to qualify for another reason as a "selected purchaser at wholesale." That alternative is available only "in the absence of sales or offers to all purchasers at wholesale," as the pam-

phlet, *supra*, puts it. Our appellate court's decision in *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, 127, C.A.D. 846, is to this same effect. Here the appraiser has made a presumed, unrefuted finding that the merchandise was sold or offered freely to all purchasers at the less favorable prices; hence, there is not an "absence" permitting the "selected purchaser" technique to be employed.

Plaintiff lays great stress on the new definition of "usual wholesale quantity" in the 1956 Act and argues with much plausibility that under it the "usual wholesale quantity" was 50 rolls or more. There are various possible doubts. Is this merchandise sold "at different prices for different quantities"? If not, the determination of usual wholesale quantity has no purpose. Here the evidence establishes that plaintiff's favorable price is not solely a quantity discount. There is nothing to refute—and the appraiser presumably found—that except through new negotiations a person not Dodge, wishing to buy 50 rolls or more could do so only at the less favorable prices. Hence the new definition of "usual wholesale quantity" does plaintiff no good. The court still has to determine at what price the merchandise is offered to the person wishing to buy the "usual wholesale quantity," whatever that is, and here it is not offered freely in any quantity except at the less favorable prices.

This result is made necessary by unambiguous statutory language and controlling decisions, as I view them. The pamphlet, *supra*, I consider also of very high authority in view of its publication by the Treasury Department, which sponsored the Customs Simplification Act of 1956, the very year it was enacted. However, I observe some disharmony between the result reached herein and the expectations entertained by the proponents of the act. Here we have actual sales of only 323 rolls in minor quantities per sale controlling the appraisement of 3,697 rolls actually imported and invoiced in good faith, at much lower prices and possibly—though not shown to be—at market. This is the tail wagging the dog situation, common in pre-1956 appraisement, which the sponsors thought was inequitable and wished to eliminate. Thus, to select an example at random, Assistant Secretary Kendall said that valuations were "often surprising to business men not experienced with import practices" and that the redefinitions will "permit the more frequent use of the actual going wholesale price when it is commercially realistic to do so." Hearings before the Committee on Finance, United States Senate, 84th Congress, second session, on section 2 of H.R. 6040, page 5. The new law, as I see it, zeroes in on some unrealistic valuation rules and leaves others to stand. The parties, however, have to take the law as they find it and the court must pass on the record before it. If any reviewing tribunal

can find a way to a different result herein it would, perhaps, contribute to justifying the expectations entertained of the new law by its sponsors.

I find as facts:

1. That the merchandise involved herein consists of two kinds of linoleum, natural tan and sea green, exported from the United Kingdom on or about December 7, 1960, and entered at the port of Philadelphia on December 30, 1960.

2. That the natural tan was appraised at $3.05 per lineal yard, and the sea green at $3.31 per lineal yard, both less trade and cash discounts of 10 percent and 5 percent, less ocean freight and insurance, plus special packing.

3. That at or about the time of exportation of the involved merchandise, such or similar merchandise was sold to Dodge Cork Co., Inc., at $2.54 per lineal yard for the natural tan and $2.91 per lineal yard for the sea green, but these prices were set by negotiation and the merchandise was not freely sold, or offered for sale to anyone at said prices.

4. That at or about the time of exportation of the involved merchandise, such or similar merchandise was freely sold in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, at $3.05 per lineal yard for the tan and $3.31 per lineal yard for the sea green, less trade and cash discounts of 10 percent and 5 percent, c.i.f. American port of entry.

5. That the cost of special packing for the merchandise at bar was $25.20.

I conclude as matters of law:

1. That export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for determining the value of the merchandise involved herein.

2. That said value is represented by the appraised values.

Judgment will be rendered accordingly.