(A.R.D. 215)

NATIONAL CARLOADING CORPORATION *v.* UNITED STATES

Entry No. 988947.

First Division, Appellate Term

(Decided on remand November 25, 1966)

*Lawrence & Tuttle* (*Edward N. Glad* of counsel); *Barnes, Richardson & Colburn* (*Norman C. Schwartz* and *Hadley S. King* of counsel), associate counsel; for the appellant.

*Barefoot Sanders*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the appellee.

Before OLIVER, NICHOLS, and WATSON, Judges

NICHOLS, Judge: This case is presently before the court upon mandate of the Court of Customs and Patent Appeals to make appropriate findings of fact and conclusions of law under section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. *National Carloading Corporation* v. *United States*, 53 CCPA 57, C.A.D. 877.

The merchandise consists of spark plugs imported from England in May of 1959. They were appraised on the basis of foreign value, as that value is defined in section 402a(c) of the Tariff Act of 1930, as amended, on the ground that spark plugs were included in the final list issued by the Secretary of the Treasury, T.D. 54521, under the description, "Automobile parts, finished." Plaintiff claimed that the merchandise was not included on the final list and should have been

appraised on the basis of export value, as defined in section 402(b) of said tariff act, as amended. The court of appeals has held that plaintiff's contention is correct. Thus, the only question before us is whether plaintiff has established what the export value is.

The merchandise involved here was sold to one selected purchaser in the United States at the invoice prices. After the original trial, the court held that no evidence had been presented to establish that the sales were in the ordinary course of trade or that the prices fairly reflected the market value. *National Carloading Corporation* v. *United States*, 47 Cust. Ct. 419, Reap. Dec. 10055. Thereafter, a rehearing was granted and additional evidence was presented. It was also held insufficient on the ground that it did not set forth evidentiary facts from which the court might make findings. *National Carloading Corporation* v. *United States*, 49 Cust. Ct. 372, Reap. Dec. 10323.

At the first trial Fritz Warren, president of Lodge Spark Plug Co., the importer, testified as follows: There are four different types of spark plugs involved, each having a different value. They consist of standard or regular plugs, platinum plugs, silver plugs, and racing plugs. His firm has had an exclusive contract with the manufacturer since August 1, 1957, which contract was to run for 5 years. Under the contract, the importer was given the exclusive right to import and sell Lodge spark plugs in the United States, except to the aviation industry. The only other firm importing Lodge spark plugs is Trans-World Engineering, which imports the shielded type and sells them for aircraft use. Trans-World does not bring in nonshielded spark plugs. It does not sell to the importer's customers, and the importer does not sell to Trans-World's customers. The prices paid by the importer were the invoice prices, and they have not varied from February 1958 to the time of trial (September 22, 1960).

At the second hearing, Mr. Warren testified that, before becoming president of Lodge Spark Plug Co. on August 1, 1957, he had been associated with British Auto Parts in San Francisco, which had sold and distributed Lodge plugs. About 4 months before August 1, 1957, British Auto Parts negotiated with Lodge Spark Plug Co. of Rugby, England, for the purchase of Lodge Spark Plug Co. of Los Angeles, its subsidiary. In the course of these negotiations, a price for the purchase of spark plugs by the American company was arrived at, which was guaranteed for 1 year and was equal to the price at which Lodge of Rugby was then selling to its wholly controlled subsidiary in the United States. Said prices were 20 cents for regular plugs, $1.05 for platinum plugs, 75 cents for racing plugs, and 25 cents for the silver-electrode plugs. These were the highest prices Lodge of Los Angeles was willing to pay.

Mr. Warren also testified that he had been engaged in distributing auto parts since 1949 and was familiar with other makes of spark

plugs manufactured in England and exported to the United States. He had handled KLG and Wypac spark plugs and said that both were distributed by sole agents, by Lodge and KLG. Apparently he meant distributed by sole agents when he was negotiating to represent them. He became familiar with the prices at which these plugs were being sold for exportation to the United States by negotiating with the manufacturers in attempting to obtain the sole agency for their distribution. According to the witness, the prices of KLG spark plugs were the same as the prices for Lodge spark plugs but the prices of Wypac plugs were lower. He considered Wypac a competitor but said its production was not as large as Lodge's. He believed KLG was a company practically equal in size to Lodge, but owned by a much larger company.

There was also received in evidence an affidavit of Harry Cock, secretary of Lodge Plugs, Ltd., of Rugby, England. (Plaintiff's exhibit 2.) It states: Spark plugs of the types manufactured and sold for export to the United States are sold to purchasers for home consumption in England through established trade distribution channels in which his company sells to wholesalers or factors. Prices vary with total annual purchases. No annual rebates or quantity discounts are given in respect to overseas sales. Sales are also made to certain large users at special contract prices which are lower. Other manufacturers of spark plugs in England are Champion Spark Plug Co., Ltd.; AC-Delco Division of General Motors, Ltd.; and K.L.G. Sparking Plugs, Ltd. The first two are subsidiaries of American companies and do not manufacture for export to the United States. The last named exports to the United States on a similar basis to that employed by his firm in that spark plugs are sold to one or more selected wholesalers. The same type of spark plugs as are sold to the importer are sold for export to countries other than the United States. The prices to some countries are higher, but, where there is a large sales potential, the prices are lower than the prices to Lodge Spark Plug. For at least a period of 2 years prior to May 1959, prices for export to the United States, including those to Lodge Spark Plug Co., have been uniform.

There was received in evidence as defendant's exhibit A a report of Treasury Representative William F. Hunton, dated January 10, 1957, concerning Lodge spark plugs. While objected to as too remote from the date of shipment, it does to some extent corroborate Mr. Cock's affidavit. It states that identical spark plugs to the four types sold for export to the United States were sold for home consumption and for general exportation to various third countries; that sales in the home market and for exportation to third countries were subject to cash discounts and rebates; that the major quantity of merchandise sold in the home market was sold to factors who received

varying rebates for quantity; and that merchandise was sold to third country customers at either original prices or amended prices, less varying cash discounts. A copy of an export pricelist from April 1, 1954, to January 5, 1957, is attached.

Export value is defined in section 402(b) of the Tariff Act of 1930, as amended, as:

* * * the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, * * *.

The term "freely sold, or, in the absence of sales offered for sale" is defined in subsection (f) (1) as sold or offered, without restrictions as to disposition or use,

(A)   to all purchasers at wholesale, or

(B)   in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise * * *.

The term "ordinary course of trade" is defined in subsection (f) (2) as:

* * * the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

The trial judge adopted the view ultimately determined to be correct by our appellate court, namely, that spark plugs were not on the "final list," and they had not been properly appraised on the basis of "foreign value." Accordingly she proceeded to consider the existence of "export value" as the mandate now directs us to do. She held that plaintiff failed to establish that the sales to the importer were in the "ordinary course of trade," stating (p. 376):

Mr. Warren's testimony and Mr. Cock's affidavit do not set forth evidentiary facts, from which the court may make findings, but merely state conclusions which plaintiff asserts should be found. This is not the proof required. Our court of appeals discussed the distinction between "evidentiary facts" and "ultimate facts" in *Brooks Paper Company* v. *United States*, 40 C.C.P.A. (Customs) 38, C.A.D. 495, and *Kobe Import Co.* v. *United States*, 42 C.C.P.A. (Customs) 194, C.A.D. 593.

Plaintiff argues that the testimony in this case stands unrebutted. (Brief, p. 6.) The question is, what are the proven facts that might be rebutted. Mr. Warren stated that competitive exports were sent to selected purchasers in the United States; but he stated this as a con-

clusion and named no purchasers. Competitive merchandise was not sufficiently described so that the court could determine whether it, in fact, truly was of the same class or kind as that under appraisement. Competitive prices were stated as the same as the invoice prices in issue. No prices were stated. Not a single competitive sale was identified.

She also found a lack of evidence to show that the invoice prices fairly reflected market value.

We agree as to the result, but some further comment is in order. Plaintiff argues with great force and conviction that it is unfair to throw on it the onus of proving in detail the practices of all the other United Kingdom exporters and United States importers of spark plugs, products of the United Kingdom. This, plaintiff says, is an impossible burden to sustain, while on the other hand the Government possesses in official papers full information as to every pertinent import transaction, and there is much information in this court's own records.

Since the trial court's determination in this case, our appellate court has approved statements of this court that there may be more than one way of doing business in merchandise of the same class or kind, both or all of which would constitute the "ordinary course of trade." In *Chr. Bjelland & Co., Inc.* v. *United States*, 52 CCPA 38, 45-46, C.A.D. 855, the court added:

* * * While an entire industry may normally do business in the same manner, a choice of a convenient manner of doing business at some variance with the others cannot exempt the parties from the force of section 402(b). This is particularly the case where, as the Customs Court correctly analyzed the evidence, the business of appellant and the exporter represents a substantial portion of the industry sales in the kind of merchandise at bar, and thus represents a substantial manner of doing business. The evidence tends to substantiate that appellant is the largest single importer of the items at bar, and the trade conditions and provisions under which it has done so have existed for some time. Accordingly, we do not find that the manner of doing business here to be outside the "ordinary course of trade" or to require the export value to be based on actual sales or offers thereof by *others* in the industry. * * * [Italics quoted.]

It would seem that, before reaching the question whether to put the plaintiff out of court for failure to produce details of the trade practices of others, we should first consider this: whether the practices of the importer alone might be substantial and established to the degree that they might constitute an "ordinary course of trade," whether or not different from the practices of others.

We have considered the record in this light. It appears that the invoice prices herein were first established between the British Lodge company and its American subsidiary before August 1957, as of which date British Lodge sold the subsidiary to an apparently independent

American company. As part of the purchase agreement, the parties agreed apparently that the American Lodge would be for 5 years the exclusive United States distributor for Lodge spark plugs, except aircraft types, and that it could purchase its requirements of Lodge spark plugs for 1 year at the price already established for the subsidiary. Plaintiff unfortunately failed or refused to produce this significant agreement, and the trial judge over repeated objection permitted secondary evidence as to some of its provisions. The result is we are left in the dark as to much about it that we need to know. As we gather, at the time of entry the period had expired during which the British company had guaranteed to maintain unchanged the prices to the American Lodge, but the exclusive agency was still in effect and the price was in fact unchanged. Whether the conditions under which they did business were normal in the trade under consideration can hardly be determined when we know so little as to what those conditions were. The parties were still operating under an agreement, one part of which was that the importer bought Lodge's United States subsidiary. This was certainly not an ordinary or usual transaction. It could occur only once. The agreement, if produced, might have told us whether purchases after the year's guarantee had expired, but while the exclusive agency was still in effect, lost the extraordinary character they surely had during the year, and became "normal to the trade."

As to other imports of British spark plugs of the kind involved, we know only that there were two other British producers and exporters to the United States, KLG and Wypac. KLG, a company about the size of Lodge, sold spark plugs at the same prices. Wypac, a smaller company, sold at lower prices. Whether this was merchandise of comparable quality is not stated. There is no clear statement in the record that Wypac sold through exclusive distributors at the time of entry involved herein, or that it did not do so. The Cock affidavit says in the present tense, i.e., as of 1962, that KLG sells through one or more "selected wholesalers." The trial judge's view that we do not know the normal 1959 trade practices of other importers, therefore, seems well taken. Plaintiff's complaint as to the impossible burden thus thrown on it would really seem for consideration by our appellate court and not for us, for the difficulty of plaintiff's burden would hardly seem to have been considered as a factor in a recent precedent in this court, *Inter-Maritime Fwdg. Co., Inc.* v. *United States*, 51 Cust. Ct. 529, A.R.D. 162. In any event, the lack of proof as to the importer's own practice is such as to require affirmance of the decision below, regardless of what may be thought of the practices of the other importers, what was shown about them and how much more we need.

We also agree that, in the present state of the record, there is nothing to show that the invoice prices fairly reflect the market value of the

merchandise. There are in fact no specific prices in evidence shown to be for such or similar merchandise, so no comparison is possible, such as was made in *United States* v. *Acme Steel Co.*, 51 CCPA 81, C.A.D. 841. Counsel stated that the importer was dealing at arm's length with the manufacturer. A clear showing of this could conceivably permit a presumption or inference that the invoice prices fairly reflected market value without a showing of other prices for comparison purposes. Counsel's statements are not proof. Should we determine without such comparative prices that the invoice prices fairly reflect market value, we would want a clear understanding of the relations between the parties, which is lacking here, as shown above. Cf. *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 715, R.D. 11169 (application for review pending).

Plaintiff further says that the appraisement, erroneously based on foreign value, is "void." However, *G. & H. Transport Co., Inc.* (*Philipp Wirth*) v. *United States*, 27 CCPA 159, C.A.D. 78, holds that an erroneous employment of the foreign value basis makes the appraisement merely erroneous, not void, and, therefore, if the importer fails to prove value under any other basis, the appraisal, though erroneous, must stand. At the time of the entry herein, the appraiser had to decide that merchandise was on a "final list" before he could employ the "foreign value" basis, and in making this decision he was, as now held, in error, but we see and plaintiff has suggested nothing in this added complication in the detail of the appraisement decision to make the *G. & H.* rule inapplicable. His decision is therefore, merely erroneous, not void, and must stand if the importer, as we have held, fails to prove the value it claims.

Plaintiff, however, relies on *Carey & Skinner, Inc.* v. *United States*, 12 Cust. Ct. 352, Reap. Dec. 5975, a review decision of this division, followed on remand, *Same* v. *Same*, 16 Cust. Ct. 361, Reap. Dec. 6279. Despite some language apparently looking the other way, 12 Cust. Ct. at 357, the final result was that an appraiser's decision was treated as void. The division held that the appraiser erred in determining the "value" of worthless scrap rope on the basis of the cost of production of new rope. No other value was proved, but the trial judge on remand appraised at the invoice value, the nominal figure of $5, instead of reinstating the appraisement. The *G. & H.* rule was not overlooked: the division cited and quoted the opinion there.

The circumstances, however, were unusual. The rope was imported for a charitable purpose, donation to the Boy Scouts. The case was widely commented on at the time as illustrating what was considered the zeal of customs officers to invoke or invent technicalities to mulct unwary importers and to instruct them as to the folly of importing

without full mastery of laws and regulations applicable. The division made what were, for it, exceptionally harsh strictures, calling the administrative decision a "most unreasonable imposition" and stating that the method of appraisement "reveals an utter disregard of the requirements of the statute * * *" (p. 357). In recent years, occasion for that kind of comment has not confronted us, and we believe the old, bad days are gone forever. Obviously an officer who insists on such an obnoxious result has got to be sure he is right, or risk having attributed to him the mental attitude attributed to the appraiser in the *Carey & Skinner* case. Beyond this, the case stands, perhaps, for the proposition that "utter disregard" of the statute on the appraiser's part is the same as where "the mandatory provisions of the pertinent statutes have not been complied with," in the language of *G. & H. Transport Co.*, page 161, and is more than mere error of fact finding or law. To some it may appear a case where the appraisal was void, not just erroneous, because, figuratively, the illegitimate baby was a big one, but others may see a more rational distinction. In any event, the case is not a controlling precedent here because it is not and cannot be alleged here that the mental attitude of the appraiser was utter disregard of the law. Others, including this division, were of the appraiser's opinion, and there is nothing to show he could have adopted the view now determined to be correct without violating Bureau instructions which were law so far as he was concerned, by force of section 502, Tariff Act of 1930. It may be added that in *Carey & Skinner*, the appraiser took the stand, affording facilities for determination of what his mental attitude actually was; here he did not, and benefits from the unrebutted presumption that he acted in good faith even when wrong.

Plaintiff also cites *Kobe Import Co.* v. *United States*, 43 CCPA 136, C.A.D. 620, but there our appellate court noted that although plaintiff there claimed the appraisement to be void, not merely erroneous, because based on value in Japan instead of China, the country of exportation, the courts below had not passed on this issue and it was unnecessary to do so in the appellate court. The case does not, therefore, lay down any rule helpful to plaintiff herein.

On the record presented we find as facts:

1. That the merchandise involved herein consists of spark plugs of various types, imported from England, and entered for consumption on May 12, 1959.

2. That, at the time of exportation, such merchandise was sold for exportation to the United States to one selected purchaser, the importer herein, at the invoice prices.

3. That the record does not establish what the normal trade practices were for the sale of the spark plugs involved herein or for the

sale of other British spark plugs of the same class or kind for exportation to the United States, nor does it establish that the prices paid by the importer fairly reflect the market value of the merchandise.

We conclude as matters of law:

1.  That the merchandise involved herein is properly dutiable on the basis of export value, as that value is defined by section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

2.  That the record is insufficient to establish a value for this merchandise in accordance with said section 402(b) of the Tariff Act of 1930, as amended.

3.  That plaintiff has not sustained its burden of proof as to values for this merchandise. That, by operation of law, 28 U.S.C., section 2633, the values of the respective items of merchandise are the appraised values.

The judgment below is affirmed.

Judgment will be rendered accordingly.