The AMERICAN GREINER
ELECTRONIC, INC.

v.

UNITED STATES.

C.D. 4718;  Court Nos. R61/20887, etc.

United States Customs Court.

Nov. 4, 1977.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, of counsel), for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (Saul Davis, Trial Atty., New York City), for defendant.

LANDIS, Judge:

These actions, consolidated for trial,[1] involve the valuation of variously described watch timers and parts exported from Switzerland in the years 1958, 1959, 1961 and 1962. The merchandise was manufactured and exported by Greiner Electronic, Ltd., of Langenthal, Switzerland. It was imported into the United States by the American Greiner Electronic, Inc., Stamford, Connecticut.

Pursuant to section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956,[2] the merchandise was appraised at various unit values on the basis of constructed value.[3] The preferred statutory basis for valuing imported merchandise is export value.[4] Plaintiff alleges that the merchandise in these consolidated actions should all be appraised at the values represented by the invoice prices on the preferred export value basis, as provided for in section 402, which defines export value, including definitions.[5]

*Definitions*

(f) For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\* \* \* \* \* \*

(4) The term "such or similar merchandise" means merchandise in the first of the

---

1. The consolidation covers 42 separate actions nominally known as appeals for reappraisement.

2. 19 U.S.C. § 1401a.

3. 19 U.S.C. § 1401a(d).

4. 19 U.S.C. § 1401a(b).

5.         *Export value*

(b) For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

■ The appraisement on the basis of constructed value is presumed to be correct.[6] Presumptively, therefore, as defined above, there was no export value for the merchandise at the times exported. *Mannesmann-Meer, Inc. v. United States,* C.A.D. 995, 433 F.2d 829, 831, 58 CCPA 6, 8 (1970). In challenging the appraisement, plaintiff must prove the price, at the times of exportation to the United States, at which the imported merchandise was freely sold in Switzerland in the ordinary course of trade for exportation to the United States.

The only evidence on the issue of export value in this case is the testimony of the president of Greiner Electronic, Ltd., Mr. Rudolph Greiner, Jr. of Langenthal, Switzerland. He testified that in 1958, after college, he went to work in the office of Swiss Greiner and also did some work in the laboratories at the plant site to broaden his technical background; that he stayed with Swiss Greiner until 1959; that in 1960 he went to work for American Greiner and remained there two years as office manager and service manager; that he returned to Swiss Greiner in 1962 and remained there until 1965 doing, successively, public relations, sales administration, pricing, invoicing, and export paper work.

Mr. Greiner further testified that Swiss Greiner organized American Greiner to service its products in the United States markets; that the business of American Greiner was to buy equipment manufactured by Swiss Greiner and then sell and service the equipment in the United States; that in the years 1958 through 1962, Swiss Greiner sold watch timers and parts to no one but American Greiner; that Swiss Greiner and American Greiner are not related companies; that they do have a common stockholder, namely, his father who at the times of exportation owned 98 percent of the stock in Swiss Greiner and 100 percent of the stock in American Greiner.

Asked if he was familiar with the manner in which the selling prices from Swiss Greiner to American Greiner were arrived at, Mr. Greiner testified that he was present and participated at most of the negotiations between Mr. Dupont, manager of American Greiner, and Mr. Lenzin, sales manager for Swiss Greiner. When questioned about the negotiations, Mr. Greiner responded as follows (R. 20–23):

Q. Was there a basis used in determining the selling price—withdrawn. I show you the Court file in R61/20887. Will you please look at the invoice in this case—take it out of the envelope, please. What does that case cover?—A. That covers two instruments, Super-Spiromatic with four plates which are accessories to that instrument.

Q. What is the date of that invoice?—A. September 30, 1959.

Q. And what is the invoice price of that merchandise?—A. 13,450 Swiss Francs.

Q. What is the unit price?—A. 6,225 Francs, for the machine.

Q. Do you know how that price was determined?—A. Yes.

---

following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

**6.** 28 U.S.C. § 2635.

Q. Tell us how it was determined—excuse me, I will ask another question. Is that the result of your participation in these various negotiations?—A. Yes, it was.

Q. That you have been talking about?—A. Yes.

Q. How was that price determined?—A. This price was determined in a negotiation between Greiner Limited and American Greiner, a negotiation that was to assure a fair profit to Swiss Greiner and to American Greiner.

Q. Do you know whether that was the basis of the negotiations for the remaining shipments that were exported?—A. That was the basis for all these exports that we are talking about.

Q. What do you say the objective was in these negotiations?—A. To come to a price that allows Swiss Greiner and American Greiner both to make a fair profit.

Q. And would you tell us whether that objective was realized?—A. For American Greiner we did not make the money that we expected to make.

Q. Can you tell us the reason or reasons for that?

\* \* \* \* \* \*

THE WITNESS: The expenses, the selling expenses and servicing expenses of American Greiner were higher than planned and the market was not as big as budgeted and because the competition was stiffer than expected.

Additionally, Mr. Greiner testified that there were other companies, competitors in Switzerland, in the same business as Swiss Greiner. (R. 26.)

On the cross-examination relevant to the negotiations between Swiss Greiner and American Greiner, Mr. Greiner restated that he did not participate in each and every negotiation involving prices, but did participate in most of them; that his father participated in some of the negotiations and while theoretically, his father had the final say, as a practical matter his father delegated the power to negotiate; that Mr. Lenzin was under obligation to make money for Swiss Greiner and Mr. Dupont had to make money for American Greiner; that in 1960 and 1961 he and Mr. Dupont worked together; that sometimes Mr. Dupont went to Switzerland and sometimes Mr. Lenzin and his father came to the United States and they would all get together and negotiate.

■ The record, in my opinion, establishes that in the period 1958 through 1962, Swiss Greiner did not sell or offer to sell the exported merchandise to anyone but American Greiner. Defendant's position to the contrary,[7] at the times of exportation, I find, therefore, that American Greiner was a "selected purchaser" within the meaning of section 402(f)(1)(B) of the Tariff Act of 1930, as amended, *supra*, footnote 5. Assessing and weighing the testimony of Rudolph Greiner, Jr., I conclude that it does not probatively establish that the invoice prices at which Swiss Greiner sold the watch timers and parts to American Greiner fairly reflect the market value of that merchandise.

The new starting point for judicial evaluation of issues involving sales to selected purchasers is *J. L. Wood v. United States*, C.A.D. 1139, 505 F.2d 1400, 62 CCPA 25 (1974). In that case, upon consideration of the legislative history and intent of section 402, as amended by the Customs Simplification Act of 1956, the court of appeals stated as follows:

From the foregoing, we conclude that Congress clearly intended that export value be determined by considering only the exporting country's market for exportation to the United States and that sales at wholesale to exclusive or selected

---

7. Based on Greiner Sr.'s control of the two companies, defendant argues that American Greiner was an agent and did not buy the merchandise from Swiss Greiner. There is, however, no evidence that ownership of the imported merchandise was not transferred from Swiss Greiner to American Greiner for a valuable consideration. *J. L. Wood v. United States*, C.A.D. 1139, 505 F.2d 1400, 1406, 62 CCPA 25, 33 (1974).

agents be used in determining export value if the prices fairly reflect the market value. *United States v. Acme Steel Co.,* 51 CCPA 81, C.A.D. 841 (1964) is hereby overruled to the extent that it approved consideration of sales in the domestic market of the exporting country in the determination of export value. * * * [505 F.2d, p. 1405, 62 CCPA, p. 32.]

The *Wood* decision has rendered obsolete much, if not all, of the case law that preceded it as to the kind of proof considered relevant in determining that a price to a selected purchaser fairly reflected market value.[8]

This case poses the difficult question raised by the *Wood* decision, that is, can a price to a selected purchaser fairly reflect market value when, as customs officials stated in commenting on the *Wood* decision:

> * * * the "necessary market evidence" is not available; i. e., when there are sales only to related selected purchasers, or sales only to one unrelated selected purchaser. Then the criterion applied by the court is not available, for there would be no "market" for export to the United States outside of the sale in question. This leaves three possible courses of action: (1) to automatically accept the price as establishing export value, (2) to automatically reject the price for lack of evidence that it fairly reflects the market value; or, (3) to use other available evidence for comparison purposes. [10 Cust. Bull. 207, T.D. 76–118 (1976).]

■ It goes without saying that the law, namely, section 402(f)(1)(B), precludes automatic acceptance or rejection of a sales price to a selected purchaser. The difficulties of proof inherent in the statutory concept of price to a selected purchaser which fairly reflects market value, notwithstanding, it is my opinion that there still must be some credible proof that price, on a sale to a selected customer fairly reflects market value, when a plaintiff seeks to substitute export value for constructed value. *Cf.,*

*Mannesmann-Meer, Inc. v. United States,* 57 Cust.Ct. 697, 702, R.D. 11243 (1966), *aff'd on review,* 62 Cust.Ct. 1023, A.R.D. 253 (1969), *aff'd on appeal,* C.A.D. 995, 433 F.2d 829, 58 CCPA 6 (1970). If it is ever possible to determine that invoice prices to a "selected purchaser at wholesale" "fairly reflect the market value" without evidence of prices in other kinds of transactions for comparison purposes, that is so only when the relations between buyer and seller are clearly set forth and are such as to warrant an inference that they dealt at arm's length. *National Carloading Corporation v. United States,* 57 Cust.Ct. 758, 759, A.R.D. 215 (1966).

As the record here fails to produce any credible standard for determining whether invoice prices fairly reflect market value, plaintiff, in my opinion, has failed to prove an export value. Plaintiff asks the court to find that the invoice prices in these consolidated actions fairly reflect market value because:

> The record establishes without dispute that the selling prices were the result of negotiations between Greiner Electronic Ltd. and American Greiner Electronic, Inc. The only witness in the case, Rudolph Greiner, Jr., was present at most of the negotiations which took place between Mr. Dupont on behalf of American Greiner and Mr. Lenzin of Greiner Ltd. * * * Mr. Greiner testified that the object of the negotiations was to assure a fair profit to Swiss Greiner and to American Greiner, that is a price which allowed both Swiss Greiner and American Greiner to make a fair profit * * *. [Plaintiff's brief, p. 17.]

■ Plaintiff further argues that the negotiations were *bona fide* because both Mr. Lenzin and Mr. Dupont were under an obligation to make a profit for their respective firms, and defendant has failed to come forward with any evidence which contradicts or weakens the importer's case. In truth, however, what defendant has or has not done, is not as important as plaintiff's

---

8. See, Sturm, *A Manual of Customs Law* (Supp.1976), p. 26.

proof. Ultimately, plaintiff's case must rest on the strength of its own evidence, assessed in practical terms, considering such factors as completeness, adequacy of bases, and possible motives to deceive. *Mannesmann-Meer, Inc. v. United States*, C.A.D. 995, 433 F.2d 829, 58 CCPA 6, 8 (1970).

In *Mannesmann-Meer*, the court of appeals approvingly analyzed the rationale of the lower court as follows:

> * * * First, the appraiser's action is presumed correct. Inherent in the appraiser's use of constructed value under 19 USC 1401a(d) was the finding that export value could not be satisfactorily determined. See 19 USC 1401a(a)(3). * * * In a practical evaluation of appellant's evidence, the tribunals below found the following weaknesses, among others, therein:
>
> 1. There was no evidence of specific transactions from which the court could judge the correctness of affiant's statement that the price charged was "normal."
>
> 2. There was no specific evidence as to how competitive conditions affected the price charged. [433 F.2d, p. 831, 58 CCPA, pp. 8–9.]

The same rationale applies to this record. Assessing and weighing plaintiff's testimony in practical terms of completeness and his knowledge of the negotiated prices, the testimony that the prices were "negotiated" raises more questions than it answers. Essentially what is missing is evidence of the specific considerations and factors that affected the negotiated prices. There is nothing wrong with a price fixed so as to assure a profit to both sides. But from the standpoint of Mr. Greiner, Sr., who owned 98 percent of the stock in Swiss Greiner and 100 percent of the stock in American Greiner, profit earned on one side of the business transaction might be more beneficial than profit earned on the other. In short, the profit motive of the seller and buyer alone does not establish that, in this case, the prices fairly reflect market value. There is no probative evidence of the manner in which the invoice prices were determined, and whether competitive conditions affected the invoice prices, or even whether the profit represented a reasonable profit in the ordinary course of trade.

Plaintiff has not overcome the presumption of correctness that attaches to the appraisements. I am not unmindful of the recent decision in *D. H. Baldwin Co. et al. v. United States*, C.D. 4704, 432 F.Supp. 1351, 78 Cust.Ct. —— (1977), appeal 77–29, and as an appeal is still pending make no comment upon it here.

I find as facts:

1. That the merchandise of these appeals consists of watch timers and parts manufactured by Greiner Electronic, Ltd., of Langenthal, Switzerland, a firm in which, at the times of exportation in 1958, 1959, 1961 and 1962, a Mr. Greiner, Sr. held 98 percent of the capital stock.

2. That the merchandise was imported by The American Greiner Electronic, Inc., of Stamford, Connecticut, a firm in which, at the times of exportation, Mr. Greiner, Sr. held 100 percent of the capital stock.

3. That, at the times of exportation, Swiss Greiner sold the merchandise of these appeals only to American Greiner.

4. That the merchandise was appraised on the basis of constructed value, as defined in section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

5. That plaintiff claims there is an export value, as defined in section 402(b), as amended.

I conclude, as a matter of law:

1. That plaintiff's proofs failed to overcome the presumption that constructed value, as defined in section 402(d), as amended, is the proper basis for valuation of the merchandise in these consolidated appeals for reappraisement.

2. That the record does not establish an export value for the merchandise, as defined in section 402(b), as amended.

3. That the constructed values are the appraised values.

Judgment will be entered accordingly.