MILLER, Judge.
This appeal is from the judgment of the United States Customs Court, C.D. 4704, 432 F.Supp. 1351, 78 Cust.Ct. 164 (1977), sustaining the Government’s appraisement of certain electric guitars and parts exported from the United Kingdom in 1967 and 1968, based on the constructed value[1] of the goods. We affirm.
Appellant D. H. Baldwin Co. (“Baldwin”) acquired the assets of Ormston Burns, Limited, a British manufacturer of guitars and amplifiers, in October 1965, changing the name of the British corporation to Baldwin-Burns, Limited (“Burns”). During 1967 and 1968, the managing director of Burns was Eugene G. Luken, a longtime employee of Baldwin, whose salary continued to be paid by Baldwin. Additionally, both the president and chairman of Baldwin served as directors of Burns. Baldwin was Burns’ *706 sole customer in the United States,[2] and, at the time of the exportations, there were no other manufacturers in the United Kingdom producing guitars of comparable price or quality.
Luken testified that the prices at which the guitars were sold included production costs, overhead, and allowance for profit; that the prices charged to Baldwin were “negotiated” and were not “set” by Baldwin; and that the difference' in prices charged to others, as opposed to Baldwin, was due to Burns’ incurring no advertising or sales commission expenses for those sales.[3] Despite efforts to set its prices to reflect an allowance for profits, Burns realized losses on its United Kingdom and other foreign country sales, and profits were realized for only a short time on its sales to Baldwin. According to Luken, this was because the anticipated market for guitars never developed.
Before the Customs Court, Baldwin attempted to prove that export value,[4] as reflected by the invoice prices of the merchandise, was the correct value; also that the prices it paid fairly reflected the market value because those prices exceeded production costs, generated a profit for Burns, and resulted from “arm’s length” negotiations. The Customs Court recognized that the mere fact that export sales are made to a selected purchaser does not preclude a showing that the merchandise was “freely sold”[5] within the statutory meaning of “export value.” However, it said that export value must be determined from the market for export to the United States and that Baldwin’s attempted use of third country sales and Burns’ production costs had “no bearing” on export value, citing this court’s decision in J. L. Wood v. United States, 505 F.2d 1400, 62 CCPA 25, C.A.D. 1139 (1974). The court’s crucial determination was that Baldwin had failed to prove that the invoice price of the goods fairly reflected market value because it failed to prove that the negotiations were at “arm’s length.” It said that the fact that the manager of the manufacturing subsidiary remained an employee of the importing parent was “inconsistent with the degree of independence which must exist between two companies whose conduct in price negotiations is to serve as the sole justification for concluding the price agreed upon fairly reflects the market value of the merchandise.” It particularly noted the absence of sales to unrelated purchasers in the United States.
OPINION
In our opinion in J. L. Wood, supra, 505 F.2d at 1405, 62 CCPA at 32, we concluded *707 that “Congress clearly intended that export value be determined by considering only the exporting country’s market for exportation to the United States and that sales at wholesale to exclusive or selected agents be used in determining export value if the prices fairly reflect the market value.”[6] (Citations omitted.) Baldwin urges that J. L. Wood should not be interpreted to preclude reference to cost data, home market sales, and third country sales in arriving at export value in the absence of sales for export to unrelated U.S. purchasers. It points to T.D. 76-118, 10 Cust.Bull. 206 (1976), as support for its argument.
In T.D. 76-118, the Customs Service stated its interpretation of J. L. Wood as follows:
[WJhere there are sales to a related selected purchaser and to several unrelated selected purchasers, or merely sales to several unrelated selected purchasers at the same price, then it [the Customs Service] is bound to look only to the exporting country’s market for exportation to the United States. .
The more difficult question is the position which should be taken when the “necessary market evidence” is not available; i. e., when there are sales only to related selected purchasers,[7] or sales only to one unrelated selected purchaser.
. Therefore, in those instances where the “necessary market evidence” does not exist, the Customs Service is required to look to whatever other evidence might be available for comparison purposes. Such evidence might include, but is not necessarily limited to, any of the following: (1) circumstances of sales, e. g., the manner in which the price was determined; (2) the relative mark-ups of the exporter and the importer; (3) quantities and level of trade; (4) home market sales; (5) sales to third countries; or (6) cost of producing the merchandise. This evidence would be used only for comparison purposes, and if it does not lead to the acceptance of the price at which the goods are invoiced, it would not be used to establish a substitute export value. [10 Cust.Bull. 207-08.]
The brief for the Government offers the following explanation of the reason that the Customs Service issued T.D. 76-118:
What the Customs Service has done in T.D. 76-118 is in effect only to announce that administratively it will apply the J. L. Wood decision within the strict confines of stare decisis and decline to assume that this Court would bring the same analysis to bear upon distinctly different fact situations. Concretely, it assumes only that this Court, if presented with a situation in which sales are made only to “related” selected purchasers or only to one unrelated selected purchaser, might still find evidence extrinsic to those sales prices (e. g., even the bona fides of the price negotiations) relevant to determining whether they “fairly reflect the market value” of that merchandise.[8]
We disagree with the position of the Customs Service set forth in T.D. 76-118 that, when the necessary market evidence is not available, it may look to evidence of home market sales, sales to third countries, or cost of producing the merchandise.[9] Our analysis in J. L. Wood of the legislative history of the Tariff Act of 1930 (“Act”) applies here. As we there pointed out (505 *708 F.2d at 1405 n. 13, 62 CCPA at 32 n. 13), export value requires that the price of the merchandise “fairly reflects the market value” — not that it reflect a “fair market value.” Thus, costs of production (factor 6 in T.D. 76-118) are irrelevant. It matters not, for purposes of determining export value, what the intrinsic value of the goods may be; what does matter is the price they can command in the market for export to the United States.
Similarly, reference to home market sales (factor 4 in T.D. 76-118) would result in a determination of foreign value which, as pointed out in J. L. Wood, Congress eliminated as a basis for valuation. (505 F.2d at 1405, 62 CCPA at 32.) Reference to third country sales (factor 5 in T.D. 76-118) is improper, because a proposal that export value be determined by considering exports to all countries, and not just the United States, was specifically rejected by Congress. (505 F.2d at 1405 n. 12, 62 CCPA at 32 n. 12.)
Our attention has not been directed to anything in the legislative history of the Tariff Act indicating Congressional intent that an exception to the manner of determining export value be made in the instance of sales to only a single related selected purchaser. Therefore, we conclude that reference to costs of production, home market sales, and third country sales would be improper[10] and that the Customs Court correctly refused to consider Baldwin’s evidence on these points.
Nevertheless, the prohibition against the above evidence does not necessarily preclude establishing an export value. The language of section 402(f)(1)(B)[11] indicates that Congress contemplated that an export value can be established for merchandise based on sales to a single selected purchaser if the price “fairly reflects the market value of the merchandise.” As we said recently in Spanexico, Inc. v. United States, 542 F.2d 568, 571, 64 CCPA -, - C.A.D. 1176 (1976)—
Appellant does not deny that, as a selected purchaser of . [the manufacturing exporter], it was obliged to show that the price it paid for the imported merchandise fairly reflected market value. In deciding whether such a showing has been made, we consider whether the sales were at arm’s length and the evidence showing the relationship between appellant and [the manufacturing exporter]. .
Accord, American Greiner Electronic, Inc. v. United States, 441 F.Supp. 915, 79 Cust.Ct. -, C.D. 4718 (1977); National Carloading Corp. v. United States, 57 Cust.Ct. 758, 759, A.R.D. 215 (1966).
The relationship between Baldwin and Burns, its wholly owned subsidiary, was close. Burns’ managing director was a longtime Baldwin employee, and his salary was paid by Baldwin. Directors of Burns included the president and the chairman of Baldwin. Baldwin initially advanced Burns £90,000 and paid in advance for all the merchandise ordered from Burns.[12] Baldwin’s witness, Eugene Luken, admitted that none of Burns’ other customers paid in advance, but, rather, made payments on “normal receipt of merchandise terms.” He also testified, in response to a question concerning any financial aid Baldwin gave to Burns, that these advance payments were a form of financial aid.
Mere testimony that the prices to Baldwin were “negotiated” [13] and that the *709 managing director of Burns “was interested in making a go of the operation” is not sufficient, considering such strong evidence of a close relationship, to establish that the prices fairly reflected market value. See American Greiner Corp., supra, 441 F.Supp. at 920, 79 Cust.Ct. at -. Nor are we persuaded by the argument that the prices to Baldwin fairly reflected market value because such prices were all that the merchandise was “realistically able to command.” Absent such evidence as arm’s length dealings between the parties, the invoice prices cannot establish the price a willing purchaser and seller would agree to in the market for exportation to the United States.
In view of the foregoing, we hold that Baldwin failed to prove that use by the Government of constructed value as the basis for appraisement was in error.
The judgment of the Customs Court is affirmed.

. Section 402(d) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1401a(d):
(d) Constructed value.
For the purposes of this section, the constructed value of imported merchandise shall be the sum of—
(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;
(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing ap-praisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and
(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

. There were sales by Bums of similar merchandise in the United Kingdom and other countries during this period.

. Luken testified that in one instance Baldwin negotiated a lower price by agreeing to a larger order from Bums.

. Section 402(b) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1401a(b):
(b) Export value.
For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing ap-praisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

. Section 402(f)(1) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1401a(f)(l):
(f) Definitions.
For the purposes of this section—
(1) The term “freely sold or, in the absence of sales, offered for sale” means sold or, in the absence of sales, offered—
(A) to all purchasers at wholesale, or
(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

. Since the evidence showed that the price to selected purchasers — both related and unrelated to the seller — was the same, we agreed with the Customs Court that the price fairly reflected the market value.

. The case before us involves sales to only a single selected purchaser, one related to the seller.

. In seeming contradiction to T.D. 76-118, the Government’s brief argues that “ [appellants’ proof in this case” with respect to manufacturing costs, home market prices, and third country prices (factors 4-6 in T.D. 76-118) “is exactly of the type considered improper or irrelevant for purposes of determining export value in J. L. Wood.”

. We express no opinion on the other stated factors.

. We note that the Customs Service, in T.D. 76-118, indicated that reference to such evidence would be used “only for comparison purposes.” However, we see no practical distinction between using such evidence to establish an export value and using it to verify an export value. The Customs Service should not be able to do indirectly what Congress has forbidden it to do directly.

. See note 5, supra.

. In Spanexieo, supra, we found that interest-free advances by the importer to the Mexican manufacturer raised doubt concerning the independence of the parties.

. A Customs Service agent’s report, introduced as evidence pursuant to 28 U.S.C. § 2635, indicates that the alleged “negotiations” consisted of Bums “asking that [it] be allowed to charge the parent firm the totals *709 shown for each model” and that Bums’ price list reflected “the prices which D. H. Baldwin have decided they will let the subsidiary charge them.”