CASCADE CORPORATION, Appellant,

v.

The UNITED STATES, Appellee.

Appeal No. 78–17; C.A.D. 1219.

United States Court of Customs and Patent Appeals.

Feb. 22, 1979.

26

Edward N. Glad, Glad, Tuttle & White, Los Angeles, Cal., for appellant.

Barbara Allen Babcock, Asst. Atty. Gen., David M. Cohen, Acting Director, Commercial Litigation Branch, Velta A. Melnbrencis, Asst. Branch Director, Federal Programs Branch, Civ. Div., Washington, D.C., for appellee.

Before MARKEY, Chief Judge, RICH, BALDWIN, LANE, and MILLER, Judges.

MARKEY, Chief Judge.

Cascade Corp. (Cascade) appeals from the judgment of the United States Customs Court, 457 F.Supp. 1022, 81 Cust.Ct. ——, C.D. 4757 (1978), sustaining the government's basis of appraisement (constructed value) of certain imported knuckleboom cranes. We affirm.

### Background

Cascade granted Toyo Umpanki Co., Ltd. (TCM), an exclusive license to manufacture and sell three models of patented knuckleboom cranes in Japan, retaining the exclusive right to import those cranes into the United States.[1] TCM paid royalties only on sales to persons other than Cascade. In addition, TCM promised to pay Cascade an

1. Cascade also granted TCM the exclusive right to sell cranes in Okinawa and Korea and the non-exclusive right to sell cranes in all other areas of the world except the United States, Canada, South Africa, Rhodesia, Australia and much of western Europe. Cascade agreed that, in special cases, it would give TCM permission to sell in countries otherwise foreclosed. Cascade also granted TCM the right to make and sell other models of cranes not at issue here.

2. The groups are listed in a "Description of Model Groups" attached to the licensing agreement. Each consists of several models. Some of the models at issue here are not specifically listed.

3. Section 402(d) provides:
   (d) Constructed value
   For the purposes of this section, the constructed value of imported merchandise shall be the sum of—
   (1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar mer-

initial engineering fee of $10,000 per "model group,"[2] and further engineering fees for any subsequent technical changes made by Cascade and resulting in substantial redesign of a model group.

Cascade imported the cranes at issue between April of 1972 and January of 1974. Customs appraised them on the basis of "constructed value," as defined by section 402(d), 19 U.S.C. § 1401a(d) (1976), of the Tariff Act of 1930, *as amended by* the Customs Simplification Act of 1956, 19 U.S.C. § 1303 *et seq.* (1976) (Act).[3] The appraised values were equal to the prices in TCM's suggested Japanese retail price list, less included installation costs not incurred by TCM on sales to Cascade.

### Customs Court Proceedings

The Customs Court found "patently erroneous," in establishing constructed value, the use of TCM's retail price list, instead of the factors enumerated in section 402(d).

Attempting to prove that the proper basis for appraisement was "export value," as defined in section 402(b) of the Act, 19 U.S.C. § 1401a(b) (1976),[4] and as reflected in

chandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;
   (2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale guantities and in the ordinary course of trade, for shipment to the United States; and
   (3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

4. Section 402(b) provides:
   (b) Export value
   For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal mar-

the invoiced prices it paid TCM, Cascade introduced a number of exhibits and the testimony of two witnesses.

The Customs Court found that Cascade and TCM were not related within the provisions of section 402(g)(2) of the Act, 19 U.S.C. § 1401a(g)(2) (1976).[5] It found the cranes to be "freely offered to a selected purchaser" within the meaning of section 402(f)(1)(B) and sold "in the ordinary course of trade" as defined in section 402(f)(2) because they were the only knuckleboom cranes manufactured in Japan and were sold exclusively to Cascade for exportation to the United States. However, the court found Cascade's evidence insufficient to establish that the invoice prices fairly reflected the prices the cranes were able to command in the market for exportation to the United States as required by section 402(f)(1)(B). Testimony that TCM's prices to Cascade were "negotiated" and included profits for TCM was found insufficient to establish that the prices resulted from arm's length negotiations.

The court treated the three crane models at issue as separate "model groups" and determined that TCM never paid the initial engineering fees for two of them and never made payments for design modifications that were sufficiently substantial to prompt TCM requests for price increases. The court also found that the actual prices paid by Cascade decreased between November of 1971 and October of 1973.

Accordingly, the court concluded that Cascade did not establish an export value, and held that the appraised value must, therefore, stand.

### Issue

The issue is whether the Customs Court erred in its holding that Cascade failed to prove that the prices it paid TCM fairly reflected market value, and thereby failed to establish an export value basis for appraisement under section 402(b).[6]

### OPINION

#### Burden of Proof

▮▮▮ It is well settled that "[a] party attacking an appraisal value has the two-fold burden of proving that the appraised value is incorrect and that his asserted val-

---

kets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f) of the Act, 19 U.S.C. § 1401a(f) (1976) provides, in pertinent part:

(f) Definitions

For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

\* \* \* \* \* \*

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise \* \* \*.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

5. Section 402(g)(2) provides:

(g) Transactions between related persons

\* \* \* \* \* \*

(2) The persons referred to in paragraph (1) are:

(A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants;

(B) Any officer or director of an organization and such organization;

(C) Partners;

(D) Employer and employee;

(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting stock or shares of any organization and such organization; and

(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

6. In view of our holding, we need not consider the argument, footnoted in the government's brief, that sales to Cascade were not "in the ordinary course of trade" as defined in section 402(f)(2).

ue is correct." *Minkap of California, Inc. v. United States*, 55 CCPA 1, 10, C.A.D. 926 (1967); *Hill Brown Corp. v. United States*, 54 CCPA 99, 104, C.A.D. 917 (1967). However, because export value takes statutory precedence over constructed value,[7] proof that the correct basis for appraisal is export value and proof clearly establishing that value obviates the need for establishing incorrectness in the government's constructed value basis of appraisement.

### Export Value

■■■ The section 402(b) requirement that the goods be "freely sold or, in the absence of sales, offered for sale" is defined in section 402(f)(1)(B) for application in "selected purchaser" situations[8] like that before us. The latter section requires that sales to selected purchasers be "at a price which fairly reflects the market value of the merchandise." The "market value" is the "price which the merchandise is able to command in the market for exportation to the United States." *J. L. Wood v. United States*, 505 F.2d 1400, 1405–06, 62 CCPA 25, 33, C.A.D. 1139 (1974). Whether a particular price fairly reflects market value is a factual question to be resolved on the basis of the evidence adduced at trial.

■■■ Consideration of the domestic market of the exporting country, or of exportations to countries other than the United States, is inappropriate. *D. H. Baldwin Co. v. United States*, 577 F.2d 704, 707–08,

65 CCPA 67, ——, C.A.D. 1208 (1978); *J. L. Wood v. United States, supra* 505 F.2d at 1405, 62 CCPA at 32. Moreover, because the price to a selected purchaser must be one that fairly reflects *the* market value, not one that reflects a *fair* market value, the price must be measured against the market value and not against the cost of production. *D. H. Baldwin Co. v. United States, supra*, 577 F.2d at 708, 65 CCPA at ——; *J. L. Wood v. United States, supra*, 505 F.2d at 1405 n.13, 62 CCPA at 32 n.13.

■■■ Where, as here, the manufacturer sells only to a single selected purchaser for exportation to the United States, export value can be established by proof that such sales were negotiated at arm's length, *D. H. Baldwin Co. v. United States, supra*, 577 F.2d at 707–08, 65 CCPA at ——, *Spanexico, Inc. v. United States*, 542 F.2d 568, 571, 64 CCPA 6, 10, C.A.D. 1176 (1976), and that the invoiced prices reflect "the price a willing purchaser and seller would agree to in the market for exportation to the United States." *D. H. Baldwin Co. v. United States, supra*, 577 F.2d at 709, 65 CCPA at ——.[9] Testimony that prices "were negotiated" or that the manufacturer made profits are not alone sufficient evidence of arm's length dealings, especially where the parties are closely related. *D. H. Baldwin Co. v. United States, supra*, 577 F.2d at 708–09, 65 CCPA at ——. Absent satisfactory explanation, evidence that the import-

---

**7.** Section 402(a) of the Act, 19 U.S.C. § 1401a(a) (1976) provides:

  (a) Value-Basis

    Except as otherwise specifically provided for in this chapter, the value of imported merchandise for the purposes of this chapter shall be—

    (1) the export value, or

    (2) if the export value cannot be determined satisfactorily, then the United States value, or

    (3) if neither the export value nor the United States value can be determined satisfactorily, then the constructed value;

except that, in the case of an imported article subject to a rate of duty based on the American selling price of a domestic article, such value shall be—

    (4) the American selling price of such domestic article.

**8.** A "selected purchaser" situation exists when a manufacturer affirmatively elects to restrict its sales to one or more purchasers and does not sell or offer its goods to purchasers generally. *Aceto Chemical Co., Inc. v. United States*, 51 CCPA 121, 127, C.A.D. 846 (1964).

**9.** In *Ernest Lowenstein, Inc. v. United States*, 425 F.Supp. 856, 862, 78 Cust.Ct. 169, 176–77, R.D. 11779 (1977), the court found "not even a scintilla of evidence" that the dealings "were anything but at arm's length and *bona fide* in all respects," and that the sole manufacturer there sold for exportation exclusively to a single, wholly unrelated company. Under those circumstances, the court held that the invoice price was the market value.

er made unusual or unrecovered financial advances to the manufacturer,[10] or gave the manufacturer preferential payment terms,[11] raises doubt as to the independence of the parties. *D. H. Baldwin Co. v. United States, supra,* 577 F.2d at 708, 65 CCPA at ——; *Spanexico, Inc. v. United States, supra* 542 F.2d at 571–72, 64 CCPA at 10.

## The Present Case

█ Concerning review of factual determinations of the Customs Court, "inquiry is limited to whether the finding is without evidence to support it or is clearly contrary to the weight of the evidence." *Artmark Chicago Ltd. v. United States,* 558 F.2d 600, 602, 64 CCPA 116, 119, C.A.D. 1192 (1977). Review of the present record makes clear the absence of error on the part of the Customs Court, which heard and correctly evaluated the testimony of the witnesses.

First, Cascade did not clearly identify the prices allegedly reflecting the market value of the cranes. Cascade characterizes its exhibit 3 as a history of the prices it paid TCM. However, Cascade's manager, who prepared the exhibit, admitted that the amounts shown do not, in all instances, equal the invoice prices actually paid by Cascade, and that he could not account for the differences. In apparent contradiction to the manager's testimony that the base price for the cranes remained constant from April of 1972 to November of 1973, exhibit 3 shows price changes in June of 1972 and in April and October of 1973. The manager testified concerning minor engineering changes for which TCM requested price increases, "a small add-on" for fitting changes, variations in the quantity of units purchased, a change from fixed to variable currency exchange rates, and a reduction in crating costs, but there is no evidence explaining the relationship between these factors and the specific price changes shown in exhibit 3, and no basis for determining the alleged "constant" base price of the cranes.

Second, Cascade did not clearly establish the mechanics for determining the claimed price. Its exhibit 1, an affidavit of TCM's exportation manager,[12] states that TCM sold cranes to Cascade during 1972 and 1973 at prices equal to TCM's suggested Japanese retail prices, less published discounts of 40%–42%. However, a letter from TCM to Cascade and a customs agent's report (government exhibits A and B) indicate discounts of 44%–45%, effective May of 1972, and 46%–47%, effective October of 1972. Moreover, Cascade's manager testified that prices were negotiated prior to each purchase order and that, beginning in 1972, the parties abandoned TCM's retail price list as a basis for price negotiations. He further testified that exhibit A did not entirely reflect the price negotiated in May of 1972 but he was unable to state whether the actual price was higher or lower.

Third, Cascade failed to describe with specificity the factors considered in setting prices. Its manager testified that crating costs and the number of units purchased were discussed but there is no evidence that the value of the cranes themselves, as opposed to peripheral items not affecting the base price of the cranes, was ever discussed. He further testified that royalties were "taken into consideration" but he did not know "whether they were included in the price or not." The latter factor is significant because TCM was exempt from royalty payments on sales to Cascade.

Exhibit 1 states that the prices to Cascade reflect a markup over TCM's costs of 14% for general expenses and profit. However, Cascade's evidence does not indicate whether that formula took account of the value to TCM of its license under Cascade's

---

**10.** *In Spanexico, Inc., supra,* the importer could not explain unrestricted, interest-free, partially-repaid advances to the manufacturer.

**11.** In *D. H. Baldwin Co., supra,* the importer gave the manufacturer a form of financial aid by paying in advance.

**12.** The affidavit was admitted over government objections that (1) Cascade did not demonstrate the affiant's unavailability for testimony, and (2) the affidavit contained unsupported conclusions.

patents [13] and technical know-how. If the purchase price was adjusted to compensate Cascade for those items, the immediate cash price represented by the invoices constitutes merely the apparent price, to which must be added the value of further consideration flowing from Cascade to TCM.

Fourth, Cascade did not adequately explain the interrelationship between financial considerations and the various provisions of the licensing agreement. For example, Cascade's manager did not know the original engineering costs for the cranes at issue or the later design modification costs. He said that TCM paid Cascade for those costs with a $10,000 engineering fee and a part of the royalty, but could not say that Cascade ever furnished TCM with a breakdown of man-hours and other costs incurred by Cascade. Moreover, the Customs Court properly found that royalty payments had no effect on the amount of engineering fees due, because the licensing agreement provides for the payment of royalties in addition to engineering fees.

Though the Customs Court's finding relating to the number of "model groups" at issue is not critical, its finding that TCM paid only a total of $10,000 in engineering fees, despite later design modifications that entitled Cascade to additional fees, is significant. In light of the manager's demonstrated lack of knowledge concerning the engineering costs, the court was not obliged to accept his characterization of the design modifications as "minor."

In short, the record lacks sufficient evidence to decide whether or not Cascade incurred unrecovered engineering cost and, if so, whether that affected the price TCM charged Cascade for the cranes.

Fifth, apart from unsupported conclusory statements that the Cascade-TCM transactions were "at arm's length" and that prices were determined "through negotiating meetings," the record reflects no evidence that the prices were the result of arm's length negotiations.

The licensing agreement provides that Cascade can (1) terminate TCM's non-exclusive marketing rights upon 90 days written notice, and (2) need not renew the agreement if it gives 6 months notice. Termination by Cascade for breach by TCM precludes TCM from manufacturing or selling any cranes for 5 years after termination. Notwithstanding the finding that the parties were not "related," as that term is defined in section 402(g)(2), the licensing agreement placed TCM in a subservient position. TCM could not make price demands, in the face of objections by Cascade, without risking loss of its capital investments devoted to crane production. In a letter to Cascade (government exhibit A), TCM states that it "will continue further efforts to be able to get near your proposed 50% discount rate." In the absence of evidence setting forth details of the alleged price "negotiations," the Customs Court was clearly justified in finding that Cascade did not satisfy its burden of proving "arm's length negotiations."

Cascade's reliance on *J. L. Wood v. United States, supra,* is misplaced. In that case, the invoice price was held to fairly reflect the market value of the goods because the foreign manufacturer made sales to both related and unrelated purchasers in the United States at identical prices. Cascade cannot stand "in the shoes" of those unrelated purchasers because it is TCM's sole United States purchaser, to which TCM's sales were, unlike those in *J. L. Wood,* the by-product of an involved licensing agreement.

### Conclusion

The Customs Court did not err in concluding that Cascade failed to establish that the invoice prices fairly reflect the market value. The appraised value must stand. The judgment of the Customs Court is *affirmed.*

*AFFIRMED.*

13. Cascade's treasurer, claiming familiarity with knuckleboom cranes and the TCM agreement, testified that Cascade owned at least one knuckleboom crane patent, that it has value, and that he did not know how many such patents Cascade owned.